IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAQUAN WILLIAMS, | ) |
|     Plaintiff | ) Case No. 1:19-cv-41 |
| | ) |
| vs. | ) RICHARD A. LANZILLO |
| | ) UNITED STATES MAGISTRATE JUDGE |
| D. LEE, et al., | ) |
| | ) MEMORANDUM OPINION ON |
|     Defendants | ) DEFENDANTS' MOTION FOR |
| | ) SUMMARY JUDGMENT |
| | ) |
| | ) ECF NO. 53 |
| | ) |

Plaintiff Laquan Williams (Williams) commenced this action pursuant to 42 U.S.C. §1983 to recover damages for alleged violations of his constitutional rights as secured by the First and Fourteenth Amendments to the United States Constitution. ECF No. 5. As Defendants, Williams has identified the following individuals, each of whom is employed at the State Correctional Institution at Forest (SCI-Forest): Unit Manager D. Lee, Unit Manager David Perry, Counselor Swanson, Hearing Examiner F. Fiscus, Deputy Superintendent J. Swattler, and correctional officers Dietrich, Wonderling, Mravintz, Coleman, Yount and Shugars. *Id.* ¶¶ 4-11.

Defendants have filed a Motion for Summary Judgment. ECF No. 53. For the reasons discussed below, Defendants' motion is granted in part and denied in part.[1]

I.    Factual Background

On April 19, 2018, the Pennsylvania Department of Corrections (DOC) transferred Williams from SCI-Retreat to SCI-Forest and placed him in the Security Threat Group

---

[1] The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge to conduct all proceedings in this case, including the entry of final judgment, as authorized by 28 U.S.C. § 636.

1

Management Unit (STGMU), a housing unit for gang-affiliated inmates who exhibit behavior that affects the security of their assigned prison facility. ECF No. 55 ¶¶ 1, 8. As previously observed by this Court, the STGMU unit at SCI-Forest "houses and provides services to inmates with affiliations to security threat groups." ECF No. 21. The STGMU program includes several "phases" through which an inmate can "progress" over time by exhibiting appropriate behavior. ECF No. 56-1 at 4. Each phase offers "progressively more privileges and services," and an inmate who progresses through each of the program's five phases ultimately qualifies for release into the prison's general population. *Id.* On the other hand, an inmate who receives disciplinary action or participates in gang-related activities may be denied advancement through the program or returned to a previous phase. *Id.*

A review of the record reveals that Williams arrived at SCI-Forest and entered the prison's STGMU program on April 19, 2018. ECF No. 56-1 at 81. As per program guidelines, Williams started in Phase 5. ECF No. 56-1 at 4 ("Phase 5 . . . is the starting point for the STGMU."). Each phase of the program typically lasts a minimum of 90 days and progression through the program is contingent upon good behavior. ECF No. 56-2 at 125. Thus, an inmate's participation in gang-related activity or receipt of a misconduct typically causes the 90-day clock to restart. ECF No. 56-2 ¶¶ 4-5. Assuming no setbacks, it appears that Williams would have been first eligible for promotion from Phase 5 to Phase 4 on or about July 16, 2018. *Id.*

Shortly after arriving at SCI-Forest, Williams filed a grievance against Swanson and Lee, the unit manager in charge of the STGMU program, in response to an issue with Williams' personal property. ECF No. 5 ¶ 15. In his verified complaint, Williams alleges that Swanson and Lee met with him shortly thereafter and vowed to "make sure [he] would never complete the STGMU program" if he was going to file grievances against them. *Id.* ¶ 16. When Williams

2

asked whether that was a threat, Lee and Swanson told him that they "[were] the judge, jury and executioner of the [STGMU] program" and always get the last word. *Id.* ¶ 17. Williams again sought clarification as to whether they were "blatantly stating that if [he] continue[d] to file grievances [he] would be subjected [to] a phase freeze/demotion." *Id.* ¶¶ 21-22. Lee and Swanson answered in the affirmative, indicating that Williams would be frozen on phase 5 indefinitely if he continued to file grievances. *Id.* ¶¶ 21-22. Lee and Swanson then demanded that Williams withdraw his property-based grievance or face the consequences. *Id.* ¶ 23. When Williams refused, they informed him that he would be receiving a 90-day phase freeze for sending out gang-related mail.[2] *Id.* ¶ 25. Lee also intimated that Williams would continue to receive false misconducts (and would thus stay indefinitely on Phase 5) for as long as he continued to file grievances. *Id.* ¶ 37. Williams has submitted affidavits from two other STGMU inmates, Augustus Simmons and Brandon Barnes, stating that Lee and Swanson issued similar threats to them in retaliation for their own grievances and lawsuits. ECF No. 62-16; ECF No. 62-17.

At some point, Perry replaced Lee as Williams' unit manager. *Id.* ¶ 41. When Williams complained to Perry about the threats issued by Lee and Swanson, Perry allegedly informed him that he was "going to follow my co-workers examples" and would not promote Williams out of Phase 5 until he stopped filing grievances. *Id.* ¶¶ 42-46. Perry also allegedly forced Williams to withdraw the federal complaint that Williams had previously filed against Lee. *See Williams v. Lee*, 1:18-cv-362 (W.D. Pa. 2018). *Id.* ¶¶ 43-44.

---

[2] Williams filed a lawsuit against Lee based on these exchanges but maintains that Perry and Swanson made him withdraw it by threatening another phase freeze. ECF No. 5 ¶¶ 43-47; ECF No. 62-15 ¶ 8.

Defendants present an entirely different version of events. According to Defendants, Williams received each of the pertinent phase freezes in response to a specific instance of punishable misconduct. The first of these occurred in late June 2018 when prison officials searched Williams' outgoing mail and discovered a letter that appeared, at least to prison officials, to contain gang-related communications. *Id.* at 79. The offending portion of the letter contained a reference to a website – www.kapodadon.1234mu.11.com – that did not exist. ECF No. 56-1. Because the numbers and letters of the website could be rearranged to form the inmate number of another DOC prisoner, Lee concluded that the letter contained gang-related material and issued a phase freeze. *Id.* Lee offered to overturn the sanction if Williams could provide proof that the website existed, but Williams apparently failed to do so. *Id.* at 69-73. Based on the ensuing misconduct, Williams had to restart at the beginning of Phase 5, delaying his promotion until the end of September. *Id.* at 73.

In November 2018, Williams received two allegedly retaliatory misconducts from Yount, a correctional officer at SCI-Forest. The first of these, Misconduct D040111, charged Williams with using abusive language during a property inventory on November 11, 2018. ECF No. 56-2 at 12. According to Yount, Williams called him a "fucking stupid, retarded, motherfucker" because he didn't like the way Yount was conducting inventory. *Id.* Williams denies using abusive language and insists that Yount sexually harassed him during the property inventory by promising to "stick the baton in your ass and . . . fuck your nigga brains out." *Id.* at 26. Williams filed a Prison Rape Elimination Act (PREA) complaint, also dated November 11, 2018, based on his version of events. *Id.* at 26-27.

On November 15, 2018, Williams received a second misconduct - Misconduct D044644 – when he allegedly refused a direct order to exit his cell and permit Yount to handcuff him for a

routine cell inspection. ECF No. 56-2 at 60. Williams maintains that Yount should not have been permitted to visit his cell while he was the subject of a pending PREA investigation and that the ensuing misconduct was intended to punish Williams for initiating that investigation. *Id.* at 66-67.

Williams' misconduct hearing was held on November 19, 2018. ECF NO. 56-2 at 13, 62. For reasons that are disputed, Williams did not have an opportunity to attend the hearing. The correctional officer who was supposed to pick up Williams for the hearing, Shugars, attributed this to an honest mistake, declaring:

> On November 11, 2018, I was assigned to the hearing examiner post. When I went to K-unit to get Inmate Williams, I went to the K-unit bubble to have another officer assist in taking Inmate Williams to his hearing. The officer there said to come with him and we proceeded to a cell and asked the inmate in the cell if he wanted to go to his hearing. The inmate replied "No".
>
> It turned out that the inmate we approached was the wrong Inmate Williams, so we never brought Inmate La-qun Williams to his hearing. This was an honest mistake, and we were in no way trying to harm Inmate Williams or retaliate against him.

ECF No. 56-2 at 127. Williams, for his part, avers that Shugars, Fiscus and Perry deliberately conspired to prevent him from attending the hearing by "falsify[ing] a waiver form with [Williams'] signature on it to support that [he] refused to attend the hearing." ECF No. 5 ¶ 54. In any event, when Williams failed to attend the hearing, the hearing examiner determined that a preponderance of evidence supported each charge because "the officer's report [was] more credible than the inmate's refusal to attend this hearing and contest [the charge]." *Id.* at 13, 62. Both misconducts were later overturned when the prison discovered that Williams had been improperly prevented from attending the hearing. *Id.* at 15, 64.

5

In addition to his retaliation and sexual harassment claims, Williams alleges that Defendant Perry violated his equal protection rights by operating the STGMU program at SCI-Forest differently than the STGMU at SCI-Greene, and that Defendants Coleman and Wonderling improperly confiscated and destroyed some of his property. The evidence of record pertaining to each of these claims will be discussed in greater detail below.

II.  Standard of Review

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the

unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must to go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if a plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.*, at 323. *See also Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

Williams is proceeding pro se. A filing from a pro se litigant is to be "liberally construed" and a "pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89. 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 206 (1976)). Additionally, when considering a motion in a pro se plaintiff's case, a court must "apply the applicable law, irrespective of whether a pro se litigant has mentioned it by name." *Holley v. Dep't of Veteran's Affairs*, 165 F.3d 244, 247-48 (3d Cir. 1999). On a motion for summary judgment, however, "a pro se plaintiff is not relieved of his obligation under [Federal Rule of Civil Procedure] 56 to point to competent evidence in the record that is capable of refuting a defendant's motion for summary judgment." *Dawson v. Cook*, 238 F. Supp. 3d 712, 717 (E.D. Pa. 2017) (citation omitted). Put another way, just because a non-moving party is proceeding pro se, they are not relieved of their "obligation

under Rule 56(c) to produce evidence that raises a genuine issue of material fact." *Id.* (quoting *Boykins v. Lucent Techs., Inc.*, 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000)); *see also Winfield v. Mazurkiewicz*, 2012 WL 4343176, *1 (W.D. Pa. Sept. 21, 2012).

III. Discussion

    A. Personal involvement

Before reaching the substantive merits of Williams' claims, Defendants Dietrich and Swattler each direct the Court to the lack of evidence connecting them to any of the alleged constitutional violations. It is well-settled that a Section 1983 plaintiff cannot prevail unless he can demonstrate that "each and every defendant was 'personal[ly] involve[d]' in depriving him of his rights." *Kirk v. Roan*, 2006 WL 2645154, at *3 (M.D. Pa. Sep. 14, 2006) (quoting *Evancho v. Fischer*, 423 F.3d 347, 353 (3d Cir. 2006)). This means that each defendant must have played an "affirmative part" in the complained-of misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). Simply responding to a grievance or receiving a letter or request slip from the plaintiff is insufficient to satisfy this requirement. *Mincy v. Chmielsewski*, 508 Fed. Appx. 99, 104 (3d Cir. 2013) ("[A]n officer's review of, or failure to investigate, an inmate's grievances generally does not satisfy the requisite personal involvement."); *Okey v. Strebig*, 2012 WL 5439042, at *8 (M.D. Pa. Nov. 7, 2012) (reiterating that a "mere allegation that an official ignored a prisoner's letter of protest . . . is insufficient to hold that official liable for the alleged violations.").

Williams' complaint lacks any factual averments directed at Swattler, and his only allegation against Dietrich is that he received a letter from Williams asking about a confiscation slip. ECF No. 5 ¶ 30. The summary judgment record similarly fails to connect either of these Defendants to his claims. In the absence of any evidence that either Defendant played an

8

affirmative role in the alleged misconduct, Dietrich and Swattler are each entitled to summary judgment.

B. Retaliation claim against Lee, Perry and Swanson

Williams contends that Defendants Lee, Perry, and Swanson intentionally impeded his progression through the STGMU program by issuing false and retaliatory misconducts and phase freezes, causing him to remain in Phase 5 for a longer period than otherwise warranted. ECF No. 1-2 ¶¶ 7-13. He also alleges that they explicitly conditioned his progression through the program on his agreement to stop filing grievances against staff members. Defendants respond that Williams' failure to progress through the STGMU program was the product by his own bad behavior and illicit activity.

To prevail on his retaliation claim, Williams must demonstrate that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take the adverse action. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016) (citing *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001)). An "adverse action" is one that would "deter a person of ordinary firmness" from exercising his First Amendment rights. *Allah v. Seiverling*, 229 F.3d 220, 225 (3d Cir. 2000) (quoting *Suppan v. Dadonna*, 203 F.3d 228, 235 (3d Cir. 2000)). Retaliatory motive can be inferred from either: (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action; or (2) a pattern of antagonism coupled with timing that suggests a causal link. *Id.* (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

9

Once a plaintiff has established that he was subjected to a retaliatory disciplinary measure, the burden shifts to the defendants to demonstrate by a preponderance of the evidence that they would have made the same penological decision absent the protected conduct. *Rauser v. Horn*, 241 F.3d 330, 334 (3d Cir. 2001). This determination requires the Court to "evaluate 'the quantum of evidence'" in support of the misconduct "to determine whether the prison officials' decision to discipline an inmate for his violations of prison policy was within the broad discretion we must afford them." *Watson*, 834 F.3d at 426. If the evidence supporting the disciplinary offense is "clear and overt," the Court should conclude that prison officials would have made the same decision to impose the disciplinary measure regardless of the inmate's protected activity. *See, e.g., Fennell v. Horvath*, 2020 WL 2556952, at *12-13 (E.D. Pa. May 20, 2020) (citing *Watson*, 834 F.3d at 426).

Here, Defendants do not contest that Williams engaged in constitutionally protected conduct by filing grievances and lawsuits or that he suffered an adverse action each time he was forced to restart the STGMU program. The parties disagree, however, as to whether those adverse actions stemmed from retaliatory animus and, if so, whether the misconducts were independently supported by a quantum of evidence. After carefully reviewing the record, the Court concludes that there are disputed material facts underpinning each of these issues. As noted above, Williams has supplied a sworn statement[3] that Swanson, Lee and Perry explicitly threatened him and conditioned his progression through the STGMU program on his agreement to withdraw his pending grievances and stop filing additional grievances. Several other inmates

---

[3] The Court must "consider as affidavits [Plaintiff's] sworn verified complaints, to the extent that they are based upon personal knowledge and set out facts that would be admissible in evidence." *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 100 n. 1 (3d Cir. 2017) (citing Fed. R. Civ. P. 56(c)(4) and *Reese v. Sparks*, 760 F.2d 64, 67 (3d Cir. 1985)).

submitted affidavits corroborating that this was a common practice in the STGMU at SCI-Forest. Moreover, the record is inconclusive as to whether the misconduct issued by Lee during this time period was supported by a quantum of evidence.[4]  Although Defendants insist that Williams' reference to a non-functional website in a letter amounted to gang activity, Williams denies that assertion, noting that the characters in almost any website containing both numbers and letters can be rearranged to form an inmate number.  There is nothing in the record indicating who the letter was intended for or explaining how or whether gang members pass encrypted messages through similar communications.  Because the content of the letter is facially innocuous, additional background testimony or contextual evidence of this nature will be required for a reasonable finder of fact to accept Defendants' representation that the letter amounted to gang activity.  As no such evidence appears in the record, summary judgment on Williams' retaliation claim against Lee, Swanson, and Perry must be denied.

    C.  Sexual harassment

Williams next asserts that Yount sexually harassed him on a handful of occasions and that Mravintz looked on.  The first instance of alleged harassment occurred on November 11, 2018, when Yount visited Williams' cell "to conduct an alleged property exchange which was a disguise for his sexual advancement towards me." ECF No. 5 ¶ 48.  Later that month, Williams was showering in the vicinity of Yount and Mravintz when Yount allegedly stated, "I have you now.  I am going to squeeze your fat black juicy ass in your wet underwears." ECF No. 62-28.

---

[4] Williams also received a misconduct from a non-Defendant on August 28, 2018, for refusing to get out of bed for cell count, covering his cell window, and using abusive language.  ECF No. 56-1 at 91.  There is no evidence in the record that this misconduct was retaliatory.

Notably, Williams has not alleged or adduced evidence that Yount or Mravintz ever actually touched him in a sexualized manner.

The Court of Appeals for the Third Circuit has recognized that the "sexual abuse of prisoners . . . offends our most basic principles of just punishment" because it "invades the most basic of dignity interests: to be treated as a human being." *Ricks v. Shover*, 891 F.3d 468, 473 (3d Cir. 2018) (quoting *Crawford v. Cuomo*, 796 F.3d 252, 260 (2d Cir. 2015)). Such claims are analyzed pursuant to the excessive force framework established in *Farmer v. Brennan*, 511 U.S. 825 (1994), which requires the inmate to demonstrate that the incident was "objectively, sufficiently intolerable and cruel," and that the official had a culpable state of mind. *Ricks*, 891 F.3d at 475 (noting that excessive force claims under *Farmer* must satisfy both an objective and a subjective element). Critically, however, "sexual harassment in the absence of contact or touching does not establish an Eighth Amendment violation." *McCain v. Wetzel*, 2018 WL 1211507, at *3 (W.D. Pa. Mar. 8, 2018) (citing *Schwenk v. Hartford*, 204 F.3d 1187, 1197 (9th Cir. 2000)). Thus, "[v]erbal harassment, including lewd comments, sexual propositioning, and the like, is not sufficient to satisfy the objective element of an Eighth Amendment sexual harassment claim." *Id.* (citing *Manon v. Garrison*, 2012 WL 3542328 (M.D. Pa. Aug. 15, 2012)). *See also Ricks*, 891 F.3d at 476, 477-78 (declining to impose a "zero tolerance" standard for "all minor sexualized touching in prison," such that all such "inappropriate touching is *per se* unconstitutional").

After carefully reviewing the summary judgment record, the Court finds no evidence from which a reasonable factfinder might infer that Yount or Mravintz ever touched Williams inappropriately. While Yount's alleged verbal harassment was inappropriate, courts have routinely held that isolated incidents of far greater severity fell short of an Eighth Amendment

12

violation. *See, e.g., McIntyre v. Kellinger*, -- Fed. Appx. --, 2018 WL 3429964, at *1 (3d Cir. July 16, 2018) (holding that incident in which defendant dragged his hands down plaintiff's buttocks, gripped his buttocks, patted his thighs, and "squeezed [his] ass as if [he] was a woman" while whispering "in a sexual manner" during a pat-search was not objectively severe or serious to establish an Eighth Amendment violation); *Ricks*, 891 F.3d at 479 (suggesting that an "isolated, momentary" incident in which guard "rubbed his erect penis against [plaintiff's] buttocks through both men's clothing" was not sufficiently severe, but allowing opportunity to amend); *Watson v. Wingard*, 2018 WL 2108316 (W.D. Pa. Jan. 31, 2018) (allegations that defendant gave plaintiff an "upper cut" to the groin with his forearm, "groped and massaged [his] penis," and examined plaintiff's "butt . . . like a doctor" did not amount to sexual abuse). In the absence of sexualized "contact or touching," *McCain*, 2018 WL 1211507, at *3, Yount and Mravintz are entitled to summary judgment.

    D.  Retaliation claim against Yount

Williams next contends that Yount engaged in unlawful retaliation by issuing two unwarranted misconducts in the immediate wake of Williams' PREA complaint. Because Williams filed his PREA complaint on November 11, 2018, and received Misconduct Reports D040111 and D044644 on November 11 and 15, 2018, he maintains that the timing of the misconducts supports an inference of unlawful retaliation. Yount responds that Williams used abusive language, refused to obey direct orders, and that he was "not aware until some time later that [Williams] issued a PREA complaint against [him]." ECF No. 56-2 at 130-131.

In this case, the precise sequence of the incidents is critical. Williams maintains that he filed his PREA complaint first and that the two misconducts arrived so quickly on its heels that they must have been retaliatory. Indeed, courts have routinely held that temporal spans as short

as one and four days between an inmate's protected conduct and the prison's adverse response were "unusually suggestive" of unlawful retaliation. *Allah*, 229 F.3d at 225. *See, e.g., Lichtenstein v. UPMC*, 691 F.3d 294, 303-04 (3d Cir. 2012) (noting that a period of time of seven days "is in the realm of what this Court and others have found sufficient" to suggest unlawful retaliation); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (two days deemed sufficient)); *Chambers v. Pennsylvania*, 2020 WL 4699045, at *8 (E.D. Pa. Aug. 13, 2020) (five days deemed sufficient). Yount, on the other hand, suggests that Williams fabricated the PREA complaint *after* receiving the first misconduct in order to get back at him for issuing that sanction. Unfortunately, it does not appear that prison grievances are time-stamped, leaving the Court with only the conflicting statements of the parties as to which of them learned of the other's conduct first. Such credibility determinations are the province of a jury.

Regardless of the timing, Yount contends that summary judgment remains appropriate because a quantum of evidence supported each of the allegedly retaliatory misconduct charges. According to Yount, the only evidence adduced at the misconduct hearing "was that Plaintiff did use abusive language towards Officer Yount on the one occasion and refused to obey an order on the other, and there was no evidence supporting Plaintiff's contention that they were retaliatory." ECF No. 54 at 7. As noted above, however, Williams never had the opportunity to appear at the hearing and present evidence to support his retaliation defense. Because Williams never had an opportunity to dispute the charges, the Court cannot conclude that they were clearly and overtly supported by a quantum of evidence, particularly where the hearing examiner relied heavily (and erroneously) upon "the inmate's refusal to attend this hearing" in rendering his finding of guilt. ECF No. 56-2 at 13. *See, e.g., Harris v. Giroux*, 2019 WL 330459, at *11-12 (W.D. Pa. Jan. 25, 2019) (denying motion for summary judgment on the same decision defense where only a

"minimal quantum of evidence" in the form of the officer's version of events was presented to support a finding of guilt). Yount's motion for summary judgment must be denied.[5]

E. Due process

Williams next contends that Shugars, Fiscus and Perry violated his constitutional right to due process by failing to ensure his attendance at the disciplinary hearings on misconducts D040111 and D044644. Although Williams served 90 days in the RHU for each misconduct, the misconducts were later vacated because Williams was prevented from attending his disciplinary hearing and challenging the misconducts.

It is well-established that an inmate's right to due process attaches only where the inmate is deprived of a legally cognizable liberty interest. *Huertas v. Sec'y Pennsylvania Dep't of Corrections*, 533 Fed. Appx. 64, 66 (3d Cir. 2013). A liberty interest exists only where some punishment or condition to which the prisoner is subjected "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). As the Court explained in *Sandin*, even confinement in "administrative or punitive segregation will rarely be sufficient, without more, to establish the kind of 'atypical' deprivation of prison life necessary to implicate a liberty interest." *Smith v. Mensinger*, 293 F.3d 641, 653 (3d Cir. 2002) (quoting *Sandin*, 515 U.S. at 486).

---

[5] Citing *Brightwell v. Lehman*, 637 F.3d 187, 194 (3d Cir. 2011), Yount also argues that "a misconduct that has been dismissed cannot be an adverse action sufficient to satisfy the second element of a retaliation claim." ECF No. 54 at 7. In *Brightwell*, the Court of Appeals held that a misconduct which is dismissed without penalty does not amount to an "adverse action" for purposes of a retaliation claim. *Id.* at 194. *See also Jordan v. Wetzel*, 2019 WL 1382512, at *4 (W.D. Pa. Mar. 27, 2019) (citing *Brightwell* for the proposition that, "in the absence of a penalty arising from an allegedly false misconduct, no adverse action is suffered"). Here, however, it is undisputed that Williams served disciplinary time in the RHU and received a phase freeze in response to each misconduct before they were overturned.

15

Here, Williams alleges that he served 90 days in the RHU based on each of the false misconducts. Disciplinary measures of this nature and duration are insufficient to establish the deprivation of a liberty interest. *See, e.g., Nifas v. Beard*, 374 Fed. Appx. 241, 244 (3d Cir. 2010) ("[C]onfinement in AC for 178 days and a 90-day placement on the RRL does not amount to an 'atypical and significant hardship' when compared to the ordinary incidents of prison life, and thus, Nifas has no protected liberty interest."); *Sanchez v. Walton*, 2019 WL 249537, at *2-3 (E.D. Pa. Jan. 16, 2019) ("Sanchez's ninety (90) day confinement in segregation is insufficient to establish that he was deprived of a liberty interest."). This is particularly true where, as explained by Defendants, Williams "would have been in the RHU anyway due to his STGMU placement." ECF No. 54 at 7. Summary judgment in favor of Shugars, Fiscus and Perry on this claim is warranted.

F. Equal protection

Williams accuses Perry, the STGMU unit manager at SCI-Forest, of operating the STGMU program at SCI-Forest more strictly than the STGMU program at SCI-Greene. Williams claims that this disparity violated his right to equal protection because "both STGMU programs are supposed to be run the same and each inmate is similar[ly] situated . . . and shall be treated the same." ECF No. 5 ¶ 87.

To survive summary judgment, Williams must identify evidence in the record "that he was treated differently than other similarly situated inmates, and that this different treatment was the result of intentional discrimination based on his membership in a protected class." *Mack v. Warden Loretto FCI*, 839 F.3d 286 (3d Cir 2016) (citing Hassan v. City of New York, 804 F.3d 277, 294 (3d Cir. 2015)). Williams has failed to satisfy either element. Neither "prisoners" nor "inmates at SCI-Forest" are a protected class, *Myrie v. Commissioner, N.J. Dep't of Corr.*, 267

16

F.3d 251, 263 (3d Cir. 2001), and there is no evidence in the record addressing whether inmates at each facility are similarly situated. In the absence of any evidence of intentional discrimination against a protected class, any variations that exist between the STGMU programs at SCI-Forest and SCI-Greene do not implicate the Constitution.

    G. Conversion

Finally, Williams asserts a state law conversion claim against Wonderling and Coleman based on the alleged confiscation and destruction of some of his personal property. To prevail on a claim for the intentional tort of conversion, a plaintiff must prove "an act of willful interference with the dominion or control over a chattel done without lawful justification, by which any person entitled to the chattel is deprived of its use and possession." *Baram v. Farugia*, 606 F.2d 42, 43 (3d Cir. 1979). Defendants respond that the doctrine of sovereign immunity bars this claim.

In general, employees of the Commonwealth of Pennsylvania acting within the scope of their duties enjoy sovereign immunity. *Walton v. Harkleroad*, 2016 WL 11480713, at *7 (W.D. Pa. Mar. 3, 2016) (citing 1 Pa. C.S. § 2310). Thus, state prison officials are immune from suit for those actions within the scope of their duties, except in instances in which the immunity has been specifically waived. Although the Pennsylvania General Assembly "has waived sovereign immunity for claims of *negligence* against Commonwealth employees in a very limited and express set of circumstances," including the "care, custody or control of personal property," it has not done so for *intentional* torts. *Id.* (citing 42 Pa.C.S. § 8522(b), (b)(3) (waiving liability for negligent acts involving, *inter alia*, the care, custody or control of personal property) (emphasis in original); *Kull v. Guisse*, 81 A.3d 148, 157 (Pa. Comm. Ct. 2013) ("[S]tate employees do not lose their immunity for *intentional* torts, provided they are acting within the scope of their

17

employment.") (citations omitted, emphasis added).  Because conversion is an intentional tort, Defendants enjoy sovereign immunity from this claim and summary judgment is warranted. *Walton*, 2016 WL 11480713, at *7; *Picarella v. Brouse*, 2020 WL 207063, at *4 (M.D. Pa. Jan. 14, 2020).

IV. Conclusion

For the reasons set forth above, the Court concludes that a genuine issue of disputed material fact exists as to Williams' retaliation claims against Lee, Swanson, Perry, and Yount. Defendants' motion for summary judgment is DENIED as to these claims and Defendants.

Defendants' motion is GRANTED as to Williams' claims for sexual harassment, due process, equal protection, and conversion.  Judgment is entered in favor of the Defendants as to each of these claims, with prejudice.  The Clerk is directed to terminate Defendants Fiscus, Shugars, Mravintz, Coleman and Wonderling from this action, with prejudice.

_____
RICHARD A. LANZILLO
United States Magistrate Judge

Dated: September 23, 2020